# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DILLARD YVONE TOLBERT, <br><br> Defendant. | No. CR06-4021-MWB <br><br> **REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

This matter is before the court on a Motion to Suppress (Doc. No. 39) filed by the defendant Dillard Yvone Tolbert on October 27, 2006. The plaintiff (the "Government") resisted the motion on November 24, 2006. (Doc. No. 42) Tolbert is charged in a one-count Indictment (Doc. No. 2) with possessing more than 50 grams of "crack" cocaine with the intent to distribute. The trial management order (Doc. No. 8) assigned motions to suppress in this case to the undersigned for the preparation of a report and recommended disposition. The court held a hearing on the motion on November 27, 2006, at which Assistant U.S. Attorney Shawn Wehde appeared on behalf of the Government, and Tolbert appeared in person with his attorney, Michael L. Smart.

At the hearing, the Government offered the testimony of Sioux City Police officers Troy Hansen and Mark Covey. The court allowed the Government to supplement the record, and on November 28, 2006, the Government submitted Gov't Ex. 1, a copy of Tolbert's videotaped post-*Miranda* statement to officers on May 5, 2006; and Gov't Ex. 2, the Pretrial Services Report prepared concerning Tolbert. The Government also submitted supplemental authorities on the issue of the admissibility of Tolbert's post-*Miranda* statement. (Doc. No. 46) The motion is now fully submitted.

## BACKGROUND FACTS

The following background facts are pertinent to Tolbert's motion to suppress. In early May 2006, a Confidential Informant (the "CI") approached Sioux City Police officers to report that an individual would be arriving in Sioux City, Iowa, by bus, carrying a shipment of crack cocaine. The CI further stated an individual named John Retland would be meeting the individual at the bus station. He gave officers information about the vehicle Retland would be driving and the motel from which Retland would be leaving to go to the bus station. Officers had utilized the same CI a couple of months earlier, and information provided by the CI had led to several felony arrests and the issuance of search warrants by state magistrates. The CI's information was corroborated by the fact that officers already were familiar with Retland's involvement in drug activities in the Sioux City area. The CI stated the courier would arrive on a bus from Kansas City on May 4, 2006, at a specific time.

On the day in question, officers set up surveillance of Retland. They observed as Retland went to the bus station, waited for a bus that arrived from Kansas City, failed to meet anyone who exited the bus, and then returned to his motel room. The CI contacted officers to report that the courier had not been on the bus but was expected to arrive in Sioux City the following morning.

The next morning, May 5, 2006, officers again initiated surveillance of Retland. This time, before going to the bus station, Retland stopped at a residence that was a known drug trafficking location and picked up an individual named Victor Harris. Retland and Harris proceeded to the bus station. A bus arrived from Kansas City, but Retland and Harris did not meet anyone. While the surveillance was in progress, the CI contacted officers and reported that the courier was not on the Kansas City bus, and he was expected to arrive that evening. Officers maintained their surveillance as Retland dropped Harris off at the residence and then returned to his hotel room. Officers continued to watch

2

Retland and that evening, Retland again picked up Harris and the two returned to the bus station. This time, Tolbert exited the bus from Kansas City. He retrieved his luggage, walked to a car in which Retland and Harris were waiting, and got into the back seat.

The car, which was being driven by Retland, was parked in an alley to the west of the bus station. Officers observed that the car was facing the wrong way in the one-way alley – a traffic violation. They decided to stop Retland for the traffic violation, and patrol cars pulled into the alley to prevent Retland from leaving the alley. Officer Nice of the Sioux City Police Department approached the vehicle and asked Retland to step out of the vehicle. He then placed Retland under arrest for driving without a valid driver's license[1] and for the traffic violation.

Harris was a passenger in the vehicle's front seat. As officers approached the vehicle, Harris threw something out of the window. Officers placed Harris under arrest for littering, and for failure to wear a seatbelt.

Officer Nice then asked Tolbert to step out of the back seat of the car. Officer Covey asked his name, and he responded, "Dillard Tolbert." Officer Covey then asked Tolbert to turn around, and explained he was going to pat Tolbert down to ensure he did not have any weapons. He patted Tolbert down, and then asked a supervising officer at the scene if Tolbert was under arrest. He was told Tolbert was not under arrest, but the supervising officer asked Officer Covey to detain Tolbert at the scene. Officer Covey then handcuffed Tolbert. The officer acknowledged Tolbert was not free to leave the scene at that time.

When Officer Covey patted Tolbert down, the officer felt an object in Tolbert's inside left coat pocket. Officer Covey asked Tolbert twice what the object was, but Tolbert did not respond either time. At the hearing, Officer Covey testified he was fairly certain the object was drugs, and he did not think the object was a weapon. Officer Covey

---

[1] Retland's driver's license was either revoke or suspended at the time.

put Tolbert into the back of his squad car. Officer Covey then told Officer Hansen he had felt something in Tolbert's pocket that he believed to be drugs. Officer Hansen approached and asked Tolbert to step out of Officer Covey's squad car. He then asked Tolbert if he had any identification and Tolbert responded he did not. Officer Hansen noted the name Tolbert had given, "Dillard Tolbert," differed from the name on his bus ticket and on his luggage tags, which was "Andre Reed." Officer Hansen then patted down Tolbert himself, and he also felt an object in Tolbert's pocket. At the suppression hearing, Officer Hansen said he could hear the sound of a plastic baggie and he felt a hard, chunky substance. The officer testified that based on his training and experience, he believed the baggie contained crack cocaine.

Officer Hansen asked Tolbert what was in the baggie. Tolbert initially said he did not know what was in the baggie, and he stated the coat he was wearing did not belong to him. Officer Hansen opened the front of Tolbert's jacket, looked down inside the pocket, and saw what he believed to be crack cocaine in a plastic baggie. The officer told Tolbert it appeared he had a large baggie of crack cocaine in his pocket, and he asked Tolbert what he thought the substance might be. Tolbert responded that the substance was crack cocaine. Officer Hansen then seized the crack cocaine and arrested Tolbert.

After Tolbert was transported back to the police station, he was placed in a room, and he waited for more than two hours before officers came in to question him.[2] When Officer Hansen and Task Force Officer Brad Downing came into the interview room, they spent a couple of minutes explaining how criminal cases work in the federal system, and then they advised Tolbert of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and interviewed him for about twenty-five minutes. Tolbert made incriminating statements during the interview about his possession

---

[2]The videotape of Tolbert's questioning, Gov't Ex. 1, shows he entered the room at time index 15:36, and officers came in to question him at 17:58.

4

with intent to distribute crack cocaine. The officers treated Tolbert with respect during the interview, and there is no indication that his statements were the result of coercion or oppression of any kind.

Tolbert moves to suppress all of the evidence seized from him at the scene of the traffic stop, arguing he was searched without probable cause. He further moves to suppress his statements at the scene of the traffic stop, contending his statements were made after he was in custody but before he had been advised of his rights. He claims his statements at the scene were not voluntary and were the result of unlawful coercion. He also moves to suppress his post-*Miranda* statements at the police station as fruit of the poisonous tree. (*See* Doc. No. 39)

## *DISCUSSION*

On this record, the court finds the officers had probable cause to stop the vehicle in the alleyway next to the bus station. Although the information at the officers' disposal likely provided probable cause to stop the vehicle in any event, clearly the officers could stop the vehicle for the traffic violation, even if the stop was pretextual. *See United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998) ("Any traffic violation, even a minor one, gives an officer probable cause to stop the violator.") The officers then had the right to arrest Retland and Harris for separate violations of the law. Having done so, the officers had the right to search the vehicle incident to the arrests. *New York v. Belton*, 453 U.S. 454, 459, 101 S. Ct. 2860, 2863, 69 L. Ed. 2d 768 (1981) ("[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.")

When the officers took Tolbert out of the vehicle, they had the right to do a patdown search for weapons. The officers had information from a CI who had proved

reliable in the past that the individuals occupying the vehicle were involved in transporting drugs. Officer Hansen testified that based on his training and experience, he believed the three individuals might be armed because it is common for drug dealers to carry weapons to protect their drugs. An officer "need not actually fear that [an] individual is armed and dangerous," as long as an officer in the same circumstances "reasonably could believe that the individual is armed and dangerous." *United States v. Hanlon*, 401 F.3d 926, 929 (8th Cir. 2005); *United States v. Roggeman*, 279 F.3d 573 (8th Cir. 2002). The circumstances here justified the officers in patting down Tolbert for weapons.

During the patdown, the officers felt something they believed to be crack cocaine. The court finds that based on the officers' training and experience, they likely could have identified crack cocaine simply by touch. Having done so, they lawfully could seize the contraband without a warrant pursuant to the "plain feel" doctrine, which is analogous to the "plain view" doctrine. *See United States v. Bustos-Torres*, 396 F.3d 935 (8th Cir. 2005) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375-77, 113 S. Ct. 2130, 2136-38 124 L. Ed. 2d 334 (1993)). The court finds the evidence seized at the scene was discovered and seized lawfully, and need not be suppressed.

By the time Officer Hansen questioned Tolbert, he clearly was in custody, even if he had not been placed under formal arrest. Officer Hansen's questions concerning what was in Tolbert's pocket came while Tolbert was in custody and before any *Miranda* warnings had been administered. The United States Supreme Court long has recognized that custodial interrogations are inherently coercive. *See Dickerson v. United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 2331, 147 L. Ed. 2d 405 (2000). As a result "*Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420, 106. S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). Those procedures include fully apprising a suspect of his rights prior to any questioning. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26. The court finds Officer

Hansen's questioning of Tolbert at the scene of the traffic stop regarding the contents of his pocket was done in violation of Tolbert's rights, and his responses, or any failure to respond, to those questions should be suppressed.

The next question is whether Tolbert's post-*Miranda* statements to officers at the police station should be suppressed. The court first notes that prior to Tolbert's questioning at the police station, he was advised of his rights pursuant to *Miranda*. The Supreme Court has noted that "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'" *Dickerson*, 530 U.S. at 444, 120 S. Ct. at 2336 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 3147, 82 L. Ed. 2d 317 (1984)). "[G]iving the [*Miranda*] warnings and getting a waiver has generally produced a virtual ticket of admissibility[.]" *Missouri v. Seibert*, 542 U.S. 600, 608-09, 124 S. Ct. 2601, 2608, 159 L. Ed. 2d 643 (2004).

A suspect may waive his rights under *Miranda* "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1628. A strong presumption exists against waiver, and the Government has the burden to show, "at least by a preponderance of the evidence," that a suspect waived his rights knowingly and intelligently. *Seibert*, 542 U.S. at 608 n.1, 124 S. Ct. at 2608 n.1 (quoting *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S. Ct. 515, 522-23, 93 L. Ed. 2d 473 (1986);and citing *Lego v. Tworney*, 404 U.S. 477, 489, 92 S. Ct. 619, 627, 30 L. Ed. 2d 618 (1972)).

In *Oregon v. Elstad*, 470 U.S. 310, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), the Supreme Court observed, "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Id.*, 470 U.S. at 309, 105 S. Ct. at 1293. However, "[t]he failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the

privilege against compulsory self-incrimination has not been intelligently exercised." *Id.*, 470 U.S. at 311 (citations omitted).

In the present case, the court finds Tolbert's unwarned statements were not coerced. As a result, factors such as the amount of time between the statements, the change in location, and the identity of the interrogators are of little importance. "In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Elstad*, 470 U.S. at 310-11, 105 S. Ct. at 1293-94 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963)). *See United States v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003) (recognizing continued viability of *Elstad* after *Dickerson*). As a result, "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Elstad*, 470 U.S. at 312, 105 S. Ct. at 1294-95.

The court has reviewed the videotape of Tolbert's interview at the police station. There is not even the slightest suggestion that Tolbert's statements were coerced, or that his waiver of rights was anything other than voluntary. The court finds administration of the *Miranda* warnings prior to Tolbert's questioning at the police station effectively cured his unwarned questioning at the scene of the traffic stop. The court further finds Tolbert made a rational, informed, and intelligent choice to waive his rights and talk with the officers at the police station.[3] As a result, Tolbert's post-*Miranda* statements need not be suppressed.

---

[3]In so concluding, the court notes, among other things, that Tolbert is no stranger to the criminal justice system. *See* Gov't Ex. 2, the Pretrial Services Report.

*CONCLUSION*

For the reasons discussed above, IT IS RESPECTFULLY RECOMMENDED, unless any party files objections to this Report and Recommendation as specified below, that Tolbert's motion to suppress be **granted in part and denied in part**, as set forth above.

Any party who objects to this report and recommendation must serve and file specific, written objections **by no later than December 15, 2005**. Any response to the objections must be served and filed **by no later than December 19, 2005.**

IMPORTANT NOTE: Any party planning to lodge any objection to this report and recommendation must order a transcript of the hearing promptly, but not later than three court days after the date of this order, <u>**regardless of whether the party believes a transcript is necessary to argue the objection**</u>. If an attorney files an objection to this report and recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 4th day of December, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT